CLOSE *et al.* v. SAMM *et al.*

1. Damages: CONTINUING TRESPASS. In an action for damages for a continuing trespass, the recovery is limited to the time of bringing the suit; and a fresh action will lie for the continuation of the trespass subsequent thereto.

2. Evidence: EXAMINATION OF PREMISES BY JURY. The object of section 3061 of the Revision, which provides for the inspection of the premises in certain cases by the jury, was to enable them the better to apply the testimony disclosed on the trial, and not to base their verdict in any degree upon such examination itself, or become silent witnesses as to facts in relation to which neither party has an opportunity to cross-examine. WRIGHT, J., not concurring.

3. —— TRESPASS: FLOODING PREMISES. In an action to recover damages for the unlawful flowing back of water upon the premises of plaintiff, and for damage to his mill-power, by the raising of defendant's dam, plaintiff would be entitled to recover upon proof of damages, to his premises alone, resulting from the back water, without any as to the water-power of his mill.

4. Adverse possession: COLOR OF TITLE. To constitute color of title and adverse possession thereunder, it is not necessary that the party in possession should hold under a valid and perfect title. He may in good faith acquire a title by adverse possession to a strip of land which is in fact beyond his lines as established by his deed or patent, and upon that of an adjacent owner.

5. —— NOTICE. To constitute adverse possession under which a title may be acquired, it is not necessary that such possession should be known to the other party. He must take notice of it at his peril.

*Appeal from Johnson District Court.*

FRIDAY, OCT. 8.

ACTION to recover damages for flowing water back upon plaintiffs' mill-wheels, premises, etc., and injury thereby to his water power. The mills and dams of the respective parties are situated on the Iowa river, a short distance above Iowa city, and about two miles apart. The plaintiffs' is the upper dam, and was constructed in 1843 by a corporation known as the Iowa City Manufacturing Company, and it is claimed by plaintiffs that its construction, maintenance and use was sanctioned and authorized by an act of the Iowa Territorial Legislature, approved Feb. 14, 1844 (see Laws of 1843–4), and that the Iowa river is a non-navigable stream at that point. The defendants' dam was constructed also in 1843, and it is claimed that its construction was authorized by an act of the Iowa Territorial Legislature, approved Feb. 15th, 1840 (see Laws of 1839–40). Both dams have been maintained and grist or flouring mills operated by the power gained thereby, ever since 1843. The plaintiffs also claim that in 1866 they erected a paper-mill and manufactory, about fifty feet below their grist-mill, which was also operated by their water power; and that in the same year (1866) and about sixty feet below the paper-mill there was a woollen manufactory erected by the Home Manufacturing Company which was also operated by their water power, under a lease of sufficient power to operate the same, granted them by the plaintiffs. The plaintiffs also allege that on the 8th day of February, 1868, the defendants raised their dam and thereby flowed water back upon the plaintiffs' premises, banks, wheels, machinery and dam, and stopped the natural flow of the water, to plaintiffs' damage five thousand dollars. This action was brought on the 25th day of February, 1868.

The defendants deny the allegations of plaintiffs' petition, except as to their ownership of the lower mill and dam, etc.; they aver that the Iowa river is a public navigable stream, at the point claimed by plaintiffs, and that the title to the bed thereof is in the United States, and not in plaintiffs. The defendants also claim that they were duly authorized to erect and maintain their dam in 1840, and that they and their grantors have maintained the same adversely to plaintiffs, their grantors and all other persons, continuously for more than ten and for more than twenty years last past, and have never abandoned their right so to back the water, and thereby plaintiffs' action is barred, if any they ever had; it is also averred that in November, 1867, defendants' dam was injured and partly torn away, but was by them repaired as soon as practicable and made the same or no greater height than before.

The cause was tried to a jury, and a large amount of testimony was introduced by the respective parties; and the jury, by direction of the court, proceeded, under the charge of the sheriff, to inspect the dams, wheels and premises testified about, and did inspect them. The jury returned a verdict for defendants. The plaintiffs appeal.

*Clark & Haddock, Fairall & Boal,* for the appellants.

*Edmunds & Ransom, Gaston & Williams,* for the appellees.

COLE, J. — I. The first point made by the appellants' counsel is upon the rejection of the offered testimony of certain witnesses. The testimony was rejected because of the stage of the proceedings at which it was offered, and as not being rebutting. Since we shall reverse the judgment for other reasons, and no such question can or

will probably again arise, it becomes wholly unnecessary to decide it here.

II. The next point in order made by appellants' counsel is upon the giving of the fifth instruction, which is as follows, to wit: " The plaintiffs, if entitled to recover at all, are only entitled to the actual damages sustained by them from the 8th to the 25th day of February, 1868, by reason of back water from defendants' dam ; and you cannot estimate the actual damages, if any, occasioned to the woolen mills by reason of the stopping of the wheels thereof by back water."

1. DAMAGES: continuing trespass.

This instruction is in accordance with the well-settled rule as to the measure of damages in such cases — that where there is a repetition or continuation of the trespass the recovery is limited to the time of bringing the suit, and a fresh action will lie for the repetition or continuation of it subsequent thereto.   Sedg. on Dam., 105, 109, 137 and 144; *Triggs* v. *Northcut*, Littell's Select Cases, 414; *Blount* v. *McCormick*, 3 Denio, 283 ; *Thayer* v. *Brooks*, 17 Ohio, 489.   Whether, under our practice, the cause of action might not be stated in the petition with a continuando,   and other special circumstances of the alleged trespass, and the claim of right so to do made by defendant, together with the facts authorizing the abatement of the dam, and a claim for its abatement and the damages accruing up to it, we need not now determine. No such case is made by the petition, and the rule as given by the court is well supported by the common law authorities.

As to the second branch of the instruction it need only be remarked that there is nothing in the pleadings or evidence entitling plaintiffs to recover for damages to the woolen mill, which belongs to other parties, who, for

Close v. Samm.

aught that appears, may themselves recover for their own damages, if any.

III. The next error assigned is upon the giving of the eighth instruction, which is as follows: "You will determine from all the evidence in the case, and all the facts and circumstances disclosed on the trial, including your personal examination, whether the water was by the act of the defendant backed up on the premises of the plaintiffs to the damage of their water power, as alleged. If you find that it was backed up to, or about, the line or beyond the line of plaintiff, but not in such a manner or to such a depth as to, at that time, or the commencement of this suit, cause any perceptible damage to the water power of plaintiffs, you will inquire no further, but find a verdict for the defendants."

2. EVIDENCE: examination of premises by jury.

Two points are made in argument upon this instruction: *First.* In allowing the jury to base their verdict, in any degree, upon their personal examination. *Second.* In requiring them to find perceptible damage to the *water power* of plaintiffs before they could return a verdict for them. During the progress of the trial, " the jury, by consent of parties and by direction of the court, proceeded, under charge of the sheriff, to inspect the dams, wheels and premises testified about, and did so inspect," as shown by the transcript. This inspection by the jury was ordered under the Revision, section 3061. Whenever, in the opinion of the court, it is proper for the jury to have a view of the real property which is the subject of controversy, or of the place in which any material fact occurred, it may order them to be conducted in a body, under the charge of an officer, to the place, which shall be shown to them by some person appointed by the court for that purpose; while the jury are thus absent, no person other than the person so appointed shall speak to them on

any subject connected with the trial." (A similar pro-
vision is made as to criminal trials. See section 4800).
The question then arises as to the purpose and intent of
this statute.    It seems to us that it was to enable the
jury, by the view of the premises or place, to better under-
stand and comprehend the testimony of the witnesses re-
specting the same, and thereby the more intelligently to
apply the testimony to the issues on trial before them,
and not to make them silent witnesses in the case, bur-
dened with testimony unknown to both parties, and in re-
spect to which no opportunity for cross-examination or cor-
rection of error, if any, could be afforded either party.
If they are thus permitted to include their personal ex-
amination, how could a court ever properly set aside their
verdict as being against the evidence, or even refuse to
set it aside without knowing the facts ascertained by such
personal examination by the jury.   It is a general rule,
certainly, if not universal, that the jury must base their
verdict upon the evidence delivered to them in open court,
and they may not take into consideration facts known to
them personally, but outside of the evidence produced
before them in court.   If a party would avail himself of the
facts known to a juror, he must have him sworn and ex-
amined as other witnesses.

And as to the second point made upon this eighth in-
struction, it also seems to us that it was not necessary for
3. —— trespass: the jury to find that there was damage to the
flooding prem-
ises.        water *power* of plaintiffs, if they found that
the water was flowed back upon the premises of plaintiffs
by the wrongful act of defendants in raising their dam.
In other words, the plaintiffs brought this suit to recover
damages for the wrongful flowing back of water upon
their premises, and for damages to their water power.
They might, therefore, recover for either.   Much of the
evidence on both sides related to the question as to

whether the flowing back of the water interfered with the plaintiffs' mill wheels, or the water power as then utilized by them. This branch of the instruction, as applied to such evidence, was at least liable to mislead the jury, even if the court intended to speak of "the water power of plaintiffs" abstractly, instead of the power as utilized by them at the time of action brought.

IV. The act of the legislature, under which the defendants claimed that their dam and mills were erected, pro-

4. ADVERSE POS- vided that the dam should not be so con-
SESSION: color
of title. structed as to flow back water upon a mill then above it on the river, and which mill, the proof in this case shows, was really below where the plaintiffs' mills now stand. The court instructed the jury that the acts of the legislature were immaterial in this action, only for one purpose, and that in determining the claim of right by defendants to back the water as explained in other instructions respecting limitation or prescription — in effect, that it afforded color of title. The plaintiffs assign this as error, and claim that since the act only gave defendants the right to flow water back to a certain point, it could not afford color of title for flowing it back beyond that point.

The court was clearly right. If the rule contended for by plaintiffs' counsel was sound, then no person could ever acquire a valid title by adverse possession under color of title, beyond the true boundary of his premises. To illustrate: A has a patent for the south half of a certain section of land, and B for the north half of the same section. A, in building his fence, sets the same five rods, more or less, upon B's land, claiming, however, that it is the true line, and he maintains it there for the time requisite to bar an action. Now, it is no answer to A's claim for B to say that the true line to which only A was authorized to go, was below his fence, and therefore his

patent could not afford him a color of title or claim above the true line. If it was a sufficient answer, then adverse possession, which required a color of title to make it available, could never bar an action. In other words, it is not necessary that the title of a party in possession of property shall be valid and perfect in order to enable him to rely upon the statute of limitations. In such case he has no need of the statute. It is only when he has gone beyond his legal right that the statute is of service to him. Of course he must make the claim in good faith, and not in wantonness, as the court expressly instructed.

V. The court was also right in holding as it did that if the possession of the defendants and the flowing back of 5. —— notice. the water by means of their dam was adverse, continuous and actual during the ten years, then they acquired a title by prescription, whether such adverse, continuous and actual possession was known to plaintiffs or their grantors or not. The title derived or fortified by possession comes from the *fact* of the actual, adverse and continuous possession, and not from *notice* of it to the adverse party. He must take notice at his peril.

The fifth and sixth instructions asked by the plaintiffs were substantially given by the court. We have now disposed of every question made by the appellants' counsel in their assignment of errors, except the one that the verdict was contrary to the evidence, and this becomes immaterial since there will be a new trial ordered for the errors as shown herein.

Reversed.

WRIGHT, J. (dissenting).—When this case was finally submitted in April last, my judgment was that it should be affirmed. A subsequent careful examination of the entire record has confirmed this impression. And I regret indeed that, while we unite in overruling all the

more material points relied upon by appellants, a majority of the court should conclude to reverse upon questions which, it seems to me, are, as applied to the actual circumstances of the case, of but little practical importance; and this the more when I reflect that the case was apparently tried with great care — occupying near ten days in its presentation to the jury — and is, to say the least, of such great doubt upon its facts as to convince me that nothing short of error the most material and prejudicial should justify an order involving the trouble and expense of a second trial, with scarcely a possibility that a different result can be reached. Finding nothing of this kind, I believe the judgment should not be disturbed.

The object of the action was to settle the right of the defendants to maintain their dam at the height shown by the testimony, on the 8th of February, 1868. And this depended upon the inquiry, whether, as thus established, it so flooded the water upon plaintiffs' *power* as to occasion any perceptible damage. The parties care nothing for any possible or real back water upon the *premises* of plaintiff which does not interfere with this power, whether in its improved or unimproved condition. To reverse the case, therefore, upon a construction of the concluding part of the eighth instruction (a conclusion, too, of at least doubtful correctness), is giving more than due weight to a matter of the least practical importance.

The language of the same instruction, however, which allowed the jury to use their " personal examination " of the premises in determining whether there was back water, etc., is the material error relied upon in this connection.

As to this, I say briefly, that the jury had a view of the premises, and that *by order of the court*. This the law allows. That they had any thing else than this view is not pretended. If the *only* object of the statute was

to enable the jury to better understand, and the more intelligently to apply the testimony of the witnesses, then I confess that I do not see why, upon this basis alone, they might not, in determining the ultimate facts, "include," or make use of, this "personal examination." If they use it to enable them *to understand and apply the testimony*, then, it seems to me, they are possessed of facts unknown to the parties — and whether the impressions received and the application of the testimony are true or false, can no more be discovered than if they have actually "burdened" themselves with *testimony*. And even in this view, therefore, the construction of the instruction would be unwarranted.

But I believe the statute intended that this personal examination or view should be used with the facts and circumstances, to aid in the determination of the cause. Thus, to take an illustration drawn from the criminal statute (which is similar to that provided for civil cases, Revision, §§ 3061, 4800) — if, in a homicide, the witnesses differ as to the distance between the parties at the time of the fatal shot, those on one side placing it at fifty, and those on the other at one hundred feet, and there is no disagreement as to the exact locality, I say the jury, having a view of the premises, have a perfect right to — that they *must*, that they cannot help calling to their aid their view of the locality and distance; and from these, with the testimony, they reach their conclusions. So, too, in a civil case, they may view "the place where any material fact occurred." A charges that B assaulted him in a building near to an inhabited dwelling to the north, but that the building had no window or other opening on that side, and that his cries for help were, hence, not heard. The existence or non-existence of such window becomes material, and the testimony is in direct conflict. The jury are conducted to the place, and now, I ask, what are

they to do? Make use of the view to apply the testimony, or see and know for themselves the exact condition of the wall — whether there is or not such opening? I say the latter.

Or, to take another illustration, drawn from this case: There was disagreement as to whether there was or was not a perceptible current immediately below plaintiffs' dam. One party attempted to establish that there was, and, hence, that there was no back-water; the other, that there was not, and hence, interference with plaintiffs' power. Now, by no means claiming that the jury could do more than *view* the premises, I maintain that they could not do otherwise than look at the actual condition of the water, and that the view thus had becomes an aid; is to them, and for them, and for each and every man, testimony. It is said there is no chance for cross-examination; that the basis of the juror's conclusion may be erroneous. I answer, " all this is equally true, if he is to have the view only to better " understand and explain the testimony. And so I might illustrate my views in many other ways, but this must suffice. And if to this conclusion, the objection is that a court could not properly set aside a verdict, as being against evidence, because it could not know what it was, I answer, *first*, that this " view " is not allowed, except in the opinion of the court it is proper. And, *second*, the legislature doubtless considered this very difficulty, and yet deemed it better to give this power — the court judging when it should be exercised — even though the difficulty of knowing upon what the verdict was based might be really increased, than to withhold it entirely. And especially so as the parties can be heard before the order is made, when this very objection, as applied to the particular case, can be fully presented and as fully considered.

VOL. XXVII. — 65

The other construction strips the statute of its purpose, and, as I think, most beneficial effect. In it, therefore, I cannot concur. Differing from the majority of the court, as I do, upon these two points, and concurring in the others, my conclusion is that the judgment should be affirmed.